TONY SCOTT TRUCKING, INC.,
Petitioner Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent
Cross-Petitioner.

Nos. 86–5115, 86–5262.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 1, 1986.

Decided April 28, 1987.

D. Patton Pelfrey, Charles E. Allen, III, James H. Massey (argued), Brown, Todd and Heyburn, Louisville, Ky., for petitioner cross-respondent.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., Collis S. Stocking/Katherine Morgan, John Welsh (argued), Emil C. Farkas, Regional Director, Region 9, N.L.R.B., Cincinnati, Ohio, for respondent cross-petitioner.

Before JONES and RYAN, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

PER CURIAM.

This is before the court on Tony Scott Trucking, Inc.'s ("Company") petition to review and the National Labor Relations Board's ("Board") cross-application to enforce an order issued by the Board against the Company on December 31, 1985. The Board found that the Company violated

§§ 8(a)(1) and (5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(a)(1) and (5) (1982), by refusing to bargain with the General Drivers, Warehousemen and Helpers Local Union No. 89 ("Union"), affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, which had been certified as the exclusive representative of an appropriate unit of the Company's employees following the representation proceedings described below. We grant the Board's petition for enforcement.

On July 11, 1984, the Union filed a petition with the Board seeking a representation election for a unit of the Company's employees. The Board conducted a secret ballot election for employees on September 6, 1984. Thirty-three valid ballots were cast, 19 in favor of and 15 against representation by the Union. The Company filed timely objections to the election, alleging that the Union had impermissibly interfered with the election by offering to waive initiation fees for those employees who signed authorization cards before the election, and by subjecting employees to threats of physical harm, racial slurs, false accusations of criminal wrongdoing, and other acts of intimidation. A hearing was held to resolve the issues raised by the objections. On November 14, 1984, the hearing officer issued a report recommending that the objections be overruled and the Union be certified. The Company filed timely exceptions to this report. On May 10, 1985, the Board adopted the hearing officer's findings and recommendations and certified the Union as the collective bargaining representative of the employees in the unit.

Thereafter, the Company refused to bargain with the Union. The Union then filed an unfair labor practice charge, and the Board issued a complaint alleging that the Company's refusal to bargain with the Union violated the NLRA. In its answer, the Company claimed that its refusal to bargain was not unlawful because the Union was improperly certified. The General Counsel moved for summary judgment and the Board issued an order to show cause why the motion should not be granted. The Company filed a response repeating its allegations that the Union's conduct had affected the outcome of the election. On December 31, 1985, the Board issued its decision and order, finding that all issues raised by the Company in the unfair labor practice proceeding were or could have been litigated in the prior representation proceeding, and that the Company had not offered any newly discovered and previously unavailable evidence or alleged any special circumstances that would warrant a reexamination of the decision in the representation proceeding. Accordingly, the Board granted the motion for summary judgment and held that the Company had violated the Act by refusing to bargain with the Union. The Board's order required that the Company cease and desist from refusing to bargain with the Union and from in any way interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by the Act.

The issue before us is whether the Board, in overruling the Company's objections and certifying the Union, acted within the "wide degree of discretion" entrusted to it by Congress in resolving questions arising during the course of representation proceedings. *See NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946). "The only question presented on judicial review is whether the Board has reasonably exercised its discretion in the matter." *Amalgamated Clothing Workers of America v. NLRB,* 424 F.2d 818, 827 (D.C.Cir.1970). The Board's findings of fact are conclusive "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). The Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it *de novo. Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

### I.

■ In its first objection, Company alleges that the Union interfered with employ-

ees' rights to refrain from union activities or membership by offering a waiver of initiation fees for employees who signed authorization cards before the election. In order to succeed in its claim, the Company must establish two elements: (1) that such an offer was made, and (2) that it was made by the Union or its agents. *See NLRB v. Savair Mfg. Co.,* 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973). In *Savair,* the Supreme Court held that a union's promise to waive initiation fees for only those employees who signed a recognition slip prior to an election unlawfully interferes with an employee's free choice in the election.

The Company bases its claim of a *Savair* violation on the testimony of two individuals. The first is Roger Curry, who testified that about two months before the election, he was approached by another employee, Jimmy Burton, who was involved in union activities, and asked to sign a union authorization card. Curry refused to sign and told Burton he "wasn't going to sign no damn card." On the afternoon of July 18, 1984, following an employee meeting called by management, Curry drove his truck past the Tri-State Bedding Company in Bowling Green, Kentucky. He observed about twenty Company employees meeting in the Tri-State parking lot. One of the employees, Lewis Burton (Jimmy's brother) called Curry over. Curry stopped and talked with Lewis and Jimmy Burton and Tom Cox, another employee. According to Curry, with Cox and Jimmy Burton standing "right beside him," Lewis Burton told Curry "that if [he] didn't sign the card, it would cost [him] $150, if [he] did [sign the card then], it would cost $10." Curry again refused to sign. Curry also testified that Jimmy Burton later approached him and said that he would "come out cheaper" if he signed a card before the election.

The second individual is Jimmy Hudson, a Company mechanic. Hudson claims that he also heard a similar representation regarding a waiver of initiation fees. Hudson, who was working on a truck at the Bowling Green Facility, overheard an unidentified employee speaking to other employees in the truck shop, saying "those that didn't sign the card now, it would cost [them] a $100 later on." Hudson, however, could not see or identify the speaker or the other individuals who were present. He also stated that no one ever asked him to sign an authorization card.

Charles Priddy, an assistant president of the Union, also testified at the hearing. He stated that he conducted only two official meetings for employees of the Company during the organizing campaign. Priddy told the employees, in response to a question, that the dues and fees for the Union were fixed and they would be the same for all employees whether or not they had signed a union card. Priddy also stated that he never authorized any employee to act as a spokesman or representative of the Union.

Lewis Burton testified and denied having made any of the statements ascribed to him by Curry. Jimmy Burton and Tom Cox both testified and denied hearing Lewis Burton say anything about initiation fees. Jimmy Burton also denied making any of the comments Curry claims he made.

After hearing this testimony, the hearing officer stated that:

> I found Curry's testimony concerning the cost of joining the Union to be less than credible. His testimony was contradictory and somewhat confused. In particular, I do not credit Curry's testimony that Lewis Burton told him that if he didn't sign a card it would cost $150 and if he did it would cost $10.

App. 51. The hearing officer then concluded that no *Savair* violation had occurred. The Board adopted this conclusion.

The Company now argues that the hearing officer's finding on this issue is erroneous. The Company relies entirely on Curry's and Hudson's testimony. It produces no new evidence and instead merely repeats the evidence presented to the hearing officer. The hearing officer was faced with conflicting testimony as to whether an offer of a waiver of initiation fees had been made. He weighed the testimony of the witnesses and chose to assign more credibility to the version presented by the Union

and its supporters. The Board adopted this finding.

■ Deference to the Board's factual findings is particularly appropriate where the "record is fraught with conflicting testimony and essential credibility determinations have been made." *NLRB v. Nueva Engineering, Inc.*, 761 F.2d 961, 965 (4th Cir.1985). The Board's determination that there was no *Savair* violation is supported by substantial evidence. Since we have concluded that the Board's finding that no offer to waive initiation fees was made is supported by substantial evidence, we need not address the second element of the alleged *Savair* violation.

## II.

The Company's second allegation is that the Union or its agents made racial slurs and threats against Curry for refusing to sign a union authorization card, planted a bag of marijuana in his truck in retaliation, and engaged in other acts of intimidation, thus precluding a fair election. Curry, a black man, testified that shortly after he refused Jimmy Burton's request that he sign an authorization card he began hearing "slurs" over the CB radio in his truck. He claims that the word "nigger" was used. He testified that at the time these slurs were used his name was not mentioned and no slurs were directed at him in person. He also testified that he overheard a conversation on the CB radio between two pro-union employees, Eddie Bryant and Tom Cox. According to Curry, Cox said, "we need to get rid of the nigger. He ain't going to help us no way." Cox allegedly then said that he "had called the Ku Klux Klan in Louisville and one of them told him they would come down and do away with a fellow for $100 and he was going to call them back that night and tell them to go ahead." Bryant reportedly then told Cox to go ahead. Curry said that he subsequently heard "slurs that didn't amount to nothing" over the CB. He also testified that the words "nigger sucks Scotty" were written with a finger in the dust on the ticket box where he picked up the papers for his loads.

Curry also testified that a bag containing marijuana was planted in his truck while it was parked at an asphalt plant where he was picking up a load. According to Curry, Cox and Burton were in the shop where the truck was located on the morning of the day the substance was found. Curry testified, however, that he did not see anyone place anything in his truck. The substance was never tested to see if it was actually marijuana and the incident was never reported to the police. Both Burton and Cox denied placing marijuana in Curry's truck. Finally, Curry testified that Cox told him that if he wasn't going to vote "yes," he should not vote at all.

Jimmy Lewis, a supervisor, testified that Curry told him about the CB threat regarding the KKK. Lewis also testified that the word "nigger" was frequently used on the CB. Jimmy Hudson, another black employee, testified that he never heard any racial slurs directed at him.

Bryant and Cox both denied participating in the conversation reported by Curry. Eight other employees who had been working in the area at the time of the alleged threats testified, and all stated that they had not heard any threats concerning the KKK. Cox and Bryant also denied making any racial slurs toward Curry. None of the other eight employees who testified reported hearing any slurs directed at Curry. The Company failed to produce any witnesses to corroborate Curry's testimony that a threat had been made against him over the CB radio.

After considering this testimony, the hearing officer concluded that: "even if I were to credit Curry's testimony concerning the threat, and the identity of its perpetrators, which I do not, I would find that it did not interfere with the election." The officer dismissed the other racial allegations as "too trivial and speculative to warrant serious consideration" and concluded that none of the "slurs were ever linked directly to any employee's support for or opposition to the [Union]." The officer also dismissed the marijuana planting allegation as "ridiculous" and concluded that Cox's alleged comment to Curry not to vote did not "constitute objectionable conduct."

The officer finally concluded that "the conduct at issue here did not create a general atmosphere that would warrant setting aside the election." The Board adopted this conclusion.

The Company now claims that the finding that the Union did not, through its agents, create a hostile and coercive atmosphere sufficient to warrant setting aside the election is arbitrary, unreasonable, and contrary to applicable law. This court has noted that "a party who seeks to overturn the results of a representation election has the burden to show that the election was not fairly conducted." *NLRB v. Bostik Div.*, 517 F.2d 971, 975 (6th Cir.1975). This burden "is not met by proof of mere misrepresentations or physical threats. Rather, specific evidence is required, showing not only that the unlawful acts occurred, but also that they interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." *NLRB v. Golden Age Beverage Co.*, 415 F.2d 26, 30 (5th Cir.1969).

An election will be overturned if the "coercive actions have created 'an atmosphere of fear and reprisal such as to render free expression of choice impossible.'" *Beaird-Poulan Div. v. NLRB*, 649 F.2d 589, 594 (8th Cir.1981) (quoting *NLRB v. Griffith Oldsmobile Inc.*, 455 F.2d 867, 870 (8th Cir.1972)); *see also Hickman Harbor Serv. v. NLRB*, 739 F.2d 214, 220 (6th Cir.1984). Such an atmosphere is created by "confusion violence and threats of violence, such as might reasonably be expected to generate anxiety and fear of reprisal." *Al Long, Inc.*, 173 NLRB 447, 448 (1968). If the objecting party fails to demonstrate the existence of such a general atmosphere, then setting aside the election is unwarranted.

■ The Company had to produce specific evidence on two points in order to have the election overturned. First, it had to prove that the coercive acts actually occurred and, second, it had to prove that these acts interfered with the employees' choice and affected the outcome of the election. The Company, however, failed to produce specific evidence on either of these points. First, it is highly debatable that the events to which Curry testified actually transpired. The hearing officer, who heard testimony on both sides of the issue, chose not to credit Curry's testimony. In light of the fact that no one corroborated Curry's testimony or heard what Curry claims was said, the officer's conclusion seems reasonable. We do not, however, necessarily believe that racial allegations should ever be treated as trivial." They require careful consideration, which the record shows occurred here. Second, the Company completely failed to produce specific evidence that any employee was affected by the alleged threats or that the outcome of the election was affected. Curry himself, the supposed target of these alleged threats, testified that on election day he "just walked in and voted." No other employee testified that his or her vote was affected by these alleged threats.

■ Finally, Cox's suggestion to Curry that he not vote unless he voted for the Union is not enough to cause the election to be overturned. The simple fact that one employee urged another to vote for union representation does not merit the setting aside of a representation election. The Board's conclusion that the election should not be set aside is supported by substantial evidence.

Therefore, the petition for enforcement is GRANTED.