RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0428P (6th Cir.)
File Name: 02a0428p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KAMTECH, INC.,

               *Petitioner,*

   *v.*

NATIONAL LABOR RELATIONS BOARD,

              *Respondent,*

INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITH, FORGERS AND HELPERS, AFL-CIO,

              *Intervenor.*

Nos. 01-1391/1558

On Petition for Review from the Decision of the National Labor Relations Board.
Nos. 25-CA-25047-1; 25-CA-25047-2.

Submitted: August 7, 2002

1

Decided and Filed:  September 4, 2002[*]

Before:  KEITH and DAUGHTREY, Circuit Judges;
CARR, District Judge.[**]

_____

**COUNSEL**

_____

**ON BRIEF:**  Meredith L. Jason, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. Eric K. Smith, LITTLER MENDELSON, Atlanta, Georgia, for Petitioner.  Michael J. Stapp, BLAKE & UHLIG, Kansas City, Kansas, for Intervenor.

_____

**OPINION**

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge.  The petitioner in this dispute, Kamtech, Inc., seeks review of an order of the National Labor Relations Board directing Kamtech to refrain from numerous acts found to have been committed in violation of the provisions of the National Labor Relations Act, 29 U.S.C. §§ 141-187, to reinstate one employee terminated from the company, and to offer a welding test to another former employee.  The Board has filed a cross-application seeking enforcement of its order.  For the reasons set out below, we order enforcement of the Board's order.

_____

[*] This decision was originally issued as an "unpublished decision" filed on September 4, 2002.  On December 3, 2002, the court designated the opinion as one recommended for full-text publication.

[**] The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

disputes when sworn testimony is offered on both sides of an issue.  *See Pikeville United Methodist Hosp.*, 109 F.3d at 1154 n.7; *Tony Scott Trucking*, 821 F.2d at 315. Consequently, despite Kamtech's claims, we decline to overturn such conclusions.

In a final allegation of error, Kamtech insists that the Board erred in "rubber-stamping" the administrative law judge's conclusion of law that the company violated the Act by "[i]nforming employees that their applications for employment would not be considered because of their union affiliation."  According to the respondent, the administrative law judge "failed to identify the evidence upon which he based his conclusion and did not address this allegation anywhere in his decision."

Contrary to Kamtech's assertion, however, the administrative law judge did indeed discuss the basis for this finding and conclusion.  The reference to Kamtech's act of informing employees that persons with union organizing credentials would not be considered for employment clearly refers to the comments made by foreman Okie Lacey to Ricky Cox in Hawesville, comments discussed by the administrative law judge at length in his decision.  Furthermore, although the company argues that Cox's testimony in this regard should not be believed, the administrative law judge was again placed in a position of making a determination of the credibility of the witnesses and chose to find that Cox was not lying in making the statements credited by the finder of fact.

### CONCLUSION

For the reasons set out above, we conclude that substantial evidence supports the Board's findings and that the Board's request for enforcement of its order must be GRANTED.  We further conclude that Kamtech's petition for review must be DENIED.

caused by such employee disobedience. Kamtech fails to recognize, however, that its own anti-union activities caused the "insubordination" and that the administrative law judge reasonably inferred that Rountree was treated differently than other employees *solely because of* his union status.

Browning chose Rountree for the particular task in question only after prematurely ending a break period at which permissible union solicitation was occurring. Moreover, the inflammatory comment, "I've just got the job for your instigating ass," provides crucial insight into Browning's motivation in assigning the perceived dangerous task. Possibly most indicative of the company's mind-set in the entire incident is the manner in which the project was ultimately completed after Browning insisted that Rountree perform the job *immediately* and by using only an available ladder. After the employee with union affiliations was terminated, Browning did not direct that another individual undertake the "rush" job at that time. Rather, all testimony before the administrative law judge points to the fact that the task was not completed for another day or two and that, when performed, the welder was permitted to use scaffolding so as to complete the job in a safe manner. Thus, it is not merely the termination of an employee for insubordination that resulted in the finding of a labor law violation in this matter. Instead, once again, it is Kamtech's knowing and conscious decision to treat union supporters among its employees differently than other workers that the administrative law judge and the Board found unlawful. Under these circumstances, the Board did not err in ordering that Rountree receive the appropriate relief for the illegal acts performed by Kamtech officials against him.

Kamtech next takes issue with the credibility determinations made by the administrative law judge in regard to the alleged interrogation of welders Mitch Dotson and Robert Young concerning their union affiliation and in regard to statements made to Michael Cornell about the futility of union membership. As we previously observed, we are uniquely *unsuited* to pass upon the legitimacy of such

### FACTUAL AND PROCEDURAL BACKGROUND

From August 1995 through April 1997, Kamtech, a New York residential, industrial, and commercial construction company, was engaged in projects in Owensboro and Hawesville, Kentucky. By May 1996, the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmith, Forgers and Helpers, AFL-CIO, had decided that it would attempt to organize the Kamtech jobs and thus dispatched union workers to the Kamtech sites to begin the process from within the plants.

Sometime in late May 1996, two union welders, James "Mitch" Dotson and Robert Young, visited the Owensboro site and informed the piping superintendent that they wished to apply for welding jobs. Although the men were told at that time that no such positions were then open, Dotson received a call in early June to return to the work site because Kamtech was again hiring welders. Both Dotson and Young responded to the request and were ultimately given welding tests by one of Kamtech's quality control agents, Wilmer Sellers. Dotson completed his test weld in approximately 15-20 minutes, inspected his work with a flashlight and telescopic mirror, and proclaimed his weld "perfect." Young also inspected Dotson's work and, based upon Young's approximately 20 years of experience as a welder, stated that he saw nothing wrong with the test weld done by his co-applicant.

When Sellers was summoned to inspect the "test," the Kamtech agent first looked at the welding job for almost a minute. He then inquired whether Dotson had been welding boiler tubes and, after receiving an affirmative response, asked bluntly, "Are y'all union?" When Dotson replied that he was indeed a union member, Sellers re-examined the test weld, pointed out a number of flaws that he, but not Dotson, saw, and informed the applicant that he had failed the test.

Similarly, after Young completed his test weld, both he and Dotson perused the work and found no defect in it. Again, however, Sellers stated that the veteran welder had failed the

test, this time after examining the applicant's work for only a few seconds. Young, who testified to the numerous welding certifications he had received over his nearly-quarter century in the profession, expressed his surprise at the results, especially given the fact that he recalled failing only one other welding test of the more than 100 he had taken over the years.

After Dotson's and Young's experiences with Kamtech, the union stepped up its organizing activities and, at a meeting on June 18, 1996, formed a committee of 14 Kamtech employees, including Michael Cornell and Mark Rountree, who agreed to distribute union cards and solicit for the labor organization. At work on June 18, prior to the meeting, Rountree discussed the plans for that evening's gathering with a number of fellow employees. Coincidentally, on that same day, Rountree was selected for one of the company's random drug tests, a procedure that usually took approximately 20 minutes. According to Rountree, however, on June 18, his test took "well over two hours" because he was first asked to accompany the safety officer as he rounded up the other individuals to be tested and then because, upon arriving at the testing trailer, he found that the nurse had gone into town with another employee who had suffered an eye injury on the job.

When Rountree finally returned to his post after giving a urine sample, he was approached by his foreman, Bob Browning, who proceeded to write up a disciplinary notice for "a loss of production, and being away from [the] work area entirely too long." When Rountree protested and attempted to explain the extenuating circumstances that led to the delay in returning to work, Browning proclaimed that "the walls have ears" and that Rountree "better watch [his] step and what [he] get[s] involved in."

The following day, June 19, 1996, union organizer Eugene Forkin delivered a letter containing the names of the 14 volunteer union organizers at the Owensboro projects to Kamtech's piping superintendent, John Webster. Immediately after delivery of the letter, numerous Kamtech employees began displaying union stickers and other

company was the result of illegal anti-union animus. As we have just recently summarized:

> In determining whether an employer has unlawfully terminated or laid off an employee on the basis of anti-union animus, this Court applies the test enunciated in *Wright Line v. NLRB*, 251 NLRB 1983 (1980). *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983) (adopting the *Wright Line* test). Under *Wright Line*, the NLRB's General Counsel must establish a prima facie case of discrimination by setting forth evidence that supports an inference that the employee's protected activities were a motivating factor in the employer's decision. In particular, the General Counsel must demonstrate that (1) the employee was engaged in protected activity; (2) that the employer knew of the employee's protected activity; and (3) that the employer acted as it did on the basis of anti-union animus. *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 226 (6th Cir. 2000) (quoting *ITT Auto. v. NLRB*, 188 F.3d 375, 388 (6th Cir. 1999). As to this third prong, we have held that evidence of an employer's anti-union animus can be purely circumstantial, and that many facts can contribute to a finding of an anti-union motive. . . . Once the General Counsel has made out a prima facie case of anti-union animus, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have taken the same action even in the absence of protected conduct." *NLRB v. Gen. §. Servs. Corp.*, 162 F.3d 437, 442 (6th Cir. 1998).

*FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 777-78 (6th Cir. 2002).

In sifting through these shifting burdens, the company again misconstrues the interplay between our nation's labor laws and daily business operations. For instance Kamtech argues that Rountree would have been discharged for his insubordination and refusing to perform an assigned task even had he not been a volunteer union organizer. In support of its position, the company then points to other terminations

of one witness or the other, and he obviously chose to believe Rountree, a credibility determination that is now effectively insulated from review on appeal.

Kamtech further asserts that no unfair labor practice can be found here because the company also routinely disciplined other workers for tardiness in returning to the job. Nevertheless, the circumstances in this case justify the inference drawn by the administrative law judge that the company's actions did indeed constitute a violation of labor law principles. First, Browning imposed the discipline upon Rountree without even bothering to check what were clearly ascertainable facts. A simple phone call to the nurse at the drug testing location could have established definitively whether Rountree was waiting patiently for the length of time he claimed to have been asked to remain away from his employment duties. In the absence of any evidence that anyone connected with the company made such a phone call, it is clearly not unreasonable for the administrative law judge to have credited the testimony of Mark Rountree, the only other witness who had actually been involved in the entire drug testing process.

Second, other elements of Rountree's testimony before the administrative law judge evidenced the anti-union bias of Browning and other Kamtech officials. According to Rountree, his inquiries about the necessity of such a reprimand were met simply by Browning's statements that "walls have ears" and that Rountree had "better watch [his] step and what [he] get[s] involved in." Such an unveiled reference to the danger of engaging in union organizing activities thus supports the Board's inference that, contrary to Browning's own testimony, Kamtech's efforts to discipline Rountree, a known organizer for the union's cause, were improperly motivated in violation of the relevant provisions of the National Labor Relations Act.

Finally, Kamtech contends that the Board cannot show that Rountree's actual discharge from employment with the

paraphernalia on their hats and other clothing. Rountree, one of the organizers, also brought union literature with him to work that day and placed it on his lunch box in the employee break room. While working on a pipe rack in that area, Rountree saw Browning, who had been "hound dogging" him the entire day, kick the union information off the lunch box.

During Rountree's first break on June 19, he distributed some of the union materials to other employees. Eventually, however, Browning joined the group, confiscated the authorization cards, and announced that "it's time to go back to work . . . – you know you only get five-minute breaks." Rountree began to explain that the employees always received ten-minute breaks and that the rest period had just begun prior to Browning's entrance. At that point, the foreman explained that the company had obviously been too kind to the workers and then stated to Rountree, "I've just got the job for your instigating ass."

Browning led Rountree to an area of the plant where he directed the employee to perform a welding job approximately 14 feet in the air in the vicinity of a concrete, square column, with a drop of 16 to 22 feet on the other side of an adjacent two-foot-high wall. Rountree, after assessing the job, explained that he would need either a lift or scaffolding to complete the welding safely. Browning insisted, however, that the job be done immediately without any such equipment that might delay the project's completion, and suggested that the welder make use of an extension ladder that was nearby. Rountree again balked at the suggestion, noting that the logistics of the job would require welding with heavy equipment in just one hand, and requested a consultation with David Frew, the company's safety officer.

Although Frew initially agreed with Rountree that the proposed plan of action did not appear to be safe, he later changed his mind after conversing with Browning and John Webster, who had also been summoned to the site. While Browning, Webster, and Frew were talking, Rountree noticed in Webster's hands the letter the superintendent had received

earlier in the day with the list of union organizers. Rountree also overheard Webster comment "I want to get rid of him."

Browning then again insisted that Rountree complete the task using only an extension ladder and not a scaffold or a lift. When Rountree continued to question the safety of the proposed assignment, Browning asked directly whether the employee intended to undertake the job. Rountree responded that such a scenario was "not likely," and Browning immediately fired Rountree for insubordination and failure to complete an assigned task. As the two men were walking to the warehouse to complete the severance forms, Browning commented to Rountree, "I warned you about this; it didn't have to be this way and you should have just stayed out of this shit."

Despite Browning's insistence upon immediate completion of the welding job, the assigned task was not performed for a couple of days after Rountree's termination. Moreover, when the job was finally attempted, the welder tackling it was allowed to use scaffolding to assist in the performance of the procedure.

After the passage of 30 days from his termination, Rountree tried to obtain another job with Kamtech at its project site in Hawesville, Kentucky, but the hiring officials at that location never responded to his inquiries. Ricky Cox, himself a Kamtech employee who had been fired for unsatisfactory work, testified before the administrative law judge that Okie Lacey, Kamtech's foreman at Hawesville, had stated to him that he couldn't hire Rountree at the Hawesville work site, despite the need for experienced welders, because Rountree had "started some union problems out at [Owensboro], trying to organize the union."

Moreover, Rountree was not the only Kamtech employee who testified to instances of anti-union animus at the Owensboro and Hawesville sites. Tony Wayne Holcomb, a pipefitter, stated that after he began wearing pro-union stickers to work, he was subjected to harassment from his

at work by 2:00 p.m., not the 4:00 p.m. hour at which Browning wrote Rountree up for missing work time. Consequently, asserts Kamtech on appeal, there is no testimony in support of Rountree's version of the events of June 18 and the administrative law judge's and Board's crediting of such "non-evidence" is, therefore, improper.

Despite the company's view of the evidence, the record before us can be read to support Rountree's account of what occurred on June 18. Kamtech now insists that the write-up occurred *immediately* upon Rountree's return to his station, and because the write-up was not undertaken until 4:00 p.m., Rountree must have been away from his job between at least noon and the time of the disciplinary action. No such strict interpretation of the testimony is mandated, however.

Neither party disputes that the paperwork involved in the disciplinary action was completed by Browning at approximately 4:00 p.m. on June 18. The factual disagreement instead centers only around how long and for what reasons Rountree was actually away from work before that time. Although Kamtech is eager to point to evidence that the employee was written up *immediately* upon his return to the plant, even Browning himself concurred with Rountree's testimony that the employee was absent for only about two hours. Such a scenario is entirely consistent with Rountree's testimony that he was away from the job first while he accompanied Frew as the safety officer gathered other test participants, and then while Rountree waited for the nurse to return from town where she had taken an injured co-worker. Furthermore, even Kamtech documents indicate that Rountree was indeed drug-tested on June 18, 1996. Although Rountree's name mysteriously did not appear on the drug testing sign-in log, the latest listed sign-in time on that sheet was 11:35 a.m. Thus, using even Browning's three-hour estimate of the time Rountree was absent from his post, had the employee appeared for the test with other workers, he would have been back at his job by 2:30 p.m., not 4:00 p.m. In the face of such an irreconcilable factual dispute, the administrative law judge was required to credit the testimony

as a TIG welder, Kamtech is clearly under no compulsion to offer him such employment.

In a series of challenges, Kamtech also contends the Board erred in upholding the administrative law judge's conclusions concerning alleged discriminatory treatment suffered by welder Mark Rountree. In particular, the company questions the Board holdings that foreman Bob Browning committed unfair labor practices in indicating that union advocates were subject to surveillance, in shortening break periods, in disciplining Rountree for an excessively lengthy absence from his job, and in terminating Rountree for refusing to perform a particular welding job. We conclude, however, that each of these contentions of error are without merit.

First, Kamtech's sole argument in opposition to the findings that Browning improperly imparted to Rountree the impression that union supporters had been monitored and that Browning shortened employees' break times in retaliation for union organizing is that Rountree should not be believed because of his past felony convictions. The administrative law judge, however, evaluated the credibility of the various witnesses before him. His ultimate determinations cannot be disregarded simply because contrary evidence was also presented, but discredited.

Second, the company insists that the administrative law judge's conclusions concerning the disciplinary write-up Rountree received for being away from his work station for an extended period of time need not be respected because the evidence offered by the General Counsel for the Board and credited by the administrative law judge was factually unsupported. Indeed, Kamtech insists that the dispute is not simply about whether Rountree had to wait for his company drug test before returning to work, but whether, even assuming such a delay, the employee misused unsupervised time during the work day. According to the company, the drug tests were conducted in the late morning hours and, therefore, even if Rountree had to wait two hours before completion of his test, the employee should have been back

foreman, Jimbo Haberzettle. According to Holcomb, Haberzettle referred to him as a "union punk," placed a sign in the break room stating that "union punks eat here," and laughed with other people about one of Holcomb's paychecks, derisively announcing, "Look what the union punk brought home, 22 cents."

Finally, Michael Cornell testified that he served without incident as a Kamtech welder under his foreman, Craig Gaston, until Cornell began to wear union buttons and after his name appeared on the letter to John Webster. After that date, asserts Cornell, Gaston approached him and announced that the employee's union organizing "isn't going to do any good" and "[is] a waste of time." Eventually, Kamtech laid Cornell off work, although the welder was one of the last craftsman to be so displaced and no structural welding was performed at the site after Cornell's departure. Later, Cornell also contacted Kamtech's Hawesville work site after hearing the company was seeking to employ welders, but the company also never returned his numerous telephone calls.

Not surprisingly, management officials at Kamtech refuted all allegations that company supervisors harbored any anti-union animus. They uniformly denied making any derogatory comments about the union or union supporters and insisted strenuously that the union activists who were discharged or laid off from the Kentucky work sites were let go only for legitimate business and disciplinary reasons.

Faced with diametrically opposed accounts of the activities involving Kamtech in Owensboro and Hawesville in the late spring and early summer of 1996, the administrative law judge assigned to resolve the labor dispute was forced to make credibility determinations on almost every unfair labor practice allegation. In doing so, he concluded that Mitch Dotson and Robert Young were not hired by the company solely because of their union affiliations and that Wilmer Sellers's interrogation of them regarding their ties to organized labor constituted coercive acts in violation of § 8(a)(1) of the National Labor Relations Act, 29 U.S.C.

§ 158(a)(1). The administrative law judge also found coercive Bob Browning's comments to Mark Rountree suggesting that union sympathizers were under surveillance and determined that Kamtech supervisors further violated the Act by imposing a more difficult and dangerous assignment upon an identified union organizer and then terminating him when he refused to perform it. The final violations of the Act found by the administrative law judge involved the comments made to Michael Cornell about the futility of union support and the company's failure to consider Cornell for welding positions because of his inclusion on the list of volunteer organizers. All other allegations made by the Board's general counsel and union representatives were found insufficient to support findings of violations of the Act.

To remedy those violations, the administrative law judge ordered Kamtech to cease and desist from engaging in the very acts that contravened the protections afforded in our nation's labor policies. He further ordered the company to reinstate Rountree, with backpay, and to offer welding jobs to Dotson, Young, and Cornell, the individuals denied employment because of their union affiliations.

On review, the Board concurred in the administrative law judge's credibility determinations and factual findings. The Board did modify the previously entered order slightly, however, by rescinding the administrative law judge's directive that Cornell be offered a position with Kamtech and, instead, ordering only that Cornell be offered the opportunity to take a welding test to determine whether he is qualified for a position with the company. Furthermore, rather than affirm the decision to offer jobs to Dotson and Young, the Board chose merely to remand the matter to the administrative law judge for reconsideration in light of the Board's decision in *FES*, 331 NLRB 20 (May 11, 2000) (setting forth the Board's position in failure-to-consider cases). In all other respects, the Board affirmed the administrative law judge's determinations.

Kamtech further insists that no evidence establishes that *Cornell's* name was also on any list and that, in any event, there is no indication that the list referred to in September was in existence in late July and early August.

The reasonable inference drawn by the Board, however, from the evidence presented before the administrative law judge is that the "list" referred to by foreman Lacey was the list of volunteer union organizers handed to John Webster by Eugene Forkin on June 19, 1996. Only that letter contained the names of the individual members of the union attempting to organize at the Owensboro plant, a list that prominently included the name of Michael Cornell directly above Mark Rountree's name. Because the information in that letter was in the possession of Kamtech personnel no later than June 19, 1996, it was reasonable for the Board to infer that the company's failure to treat Cornell in the same manner the company treated non-union job applicants in late July and early August was based on the employee's union organizing activities as documented in June. On appeal, "[t]his court may not displace reasonable inferences of the Board." *Pikeville United Methodist Hosp.*, 109 F.3d at 1154.[3]

Finally, the Board modified the administrative law judge's ruling regarding Cornell so as to order Kamtech to test Cornell for his proficiency as a welder, not necessarily to rehire the former employee. For this reason also, therefore, the company's citation to *Fluor Daniel* is inapposite. In accordance with the challenged Board ruling, if the welding test reveals that Cornell is indeed not qualified for a position

---

[3]Kamtech also objects to the Board's finding in this regard based upon the company's disagreement with the administrative law judge's decision to credit the testimony of Ricky Cox rather than the testimony of Okie Lacey. But, under well-established precedent, we will not disturb agency credibility determinations in the face of conflicting testimony. *See Tony Scott Trucking*, 821 F.2d at 315. "The assignment of credibility to witnesses is the prerogative of the Board." *Pikeville United Methodist Hosp.*, 109 F.3d at 1154 n.7 (quoting *Union Carbide Corp. v. NLRB*, 714 F.2d 657, 660 (6th Cir. 1983)).

being rejected for a position for which he admittedly was not qualified. No reasonable explanation, other than that inferred by the Board, can thus explain how a veteran welder like Cornell, with prior employment experience with the company, could be rejected out-of-hand for a position for which he applied.[2]   When all applicants for welding positions are offered welding tests to determine their qualifications, a company is prohibited by the Act from selectively discriminating against only union members by denying them equal opportunities to compete for available positions. The Board's finding of a violation of the Act in this regard must, therefore, be affirmed.

As an additional basis for challenging the Board's decision regarding the failure to consider Cornell's "application," Kamtech asserts that any evidence of the company's anti-union animus toward the employee is based solely upon testimony concerning another individual at a time different from that at which Cornell sought to be rehired. This contention is also lacking in both logic and merit. In advancing its defense to this charge, Kamtech claims that the only evidence of its anti-union bias at Hawesville was demonstrated through the contested testimony of Ricky Cox, who overheard foreman Lacey state *in September* 1996 that he couldn't hire *Mark Rountree* because of Rountree's inclusion on a list at the Owensboro plant for starting "some union problems . . . , trying to organize the union." Kamtech then argues that the Board improperly extrapolated that animus to the decision to treat *Cornell* differently when he applied for a position in Hawesville in late July and early August 1996.

---

[2]Further undermining Kamtech's assertion that Cornell was not even *considered* for hiring due to his lack of qualifications is the testimony of Barry Roberts, a project manager at Kamtech, who admitted that even 70% of the TIG welders failed the welding test given by the company. If seven of every ten applicants who claim to be TIG welders fail to perform the test satisfactorily, but yet are permitted to *attempt* to succeed in performing the job prerequisite, the company's explanation that Cornell was not allowed to attempt a welding test because he did not demonstrate sufficient knowledge of the craft *over the telephone* rings hollow indeed.

## DISCUSSION

Pursuant to the provisions of 29 U.S.C. § 157:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

Congress has decreed protection of these important rights by making it an unfair labor practice on the part of employers to, among other things, "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title," 29 U.S.C. § 158(a)(1), or "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

As we have noted, an employer generally commits an unfair labor practice by making an employment decision that discourages union membership or interferes with an employee's right to organize. *See Opportunity Homes v. NLRB*, 101 F.3d 1515, 1518 (6th Cir. 1996), *overruled on other grounds in NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115 (6th Cir. 1997). The threshold test for determining whether the employment decision constitutes an unfair labor practice is whether the decision was motivated by anti-union animus. *See NLRB v. Cook Family Foods, Ltd.*, 47 F.3d 809, 816 (6th Cir. 1995).

The Board bears the initial burden of establishing, by a preponderance of the evidence, that the employer's decision was motivated by the employees' exercise of their rights

protected by the National Labor Relations Act. *See Director, Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 278 (1994). After such a *prima facie* showing has been made by the Board, the burden of persuasion shifts to the employer to prove, again by a preponderance of the evidence, the affirmative defense that the same employment decision would have been made even in the absence of any protected labor activity. *See W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995).

Board findings of fact are conclusive on appeal if supported by substantial evidence on the record. *See* 29 U.S.C. §§ 160(e) and (f). "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Opportunity Homes*, 101 F.3d at 1518 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Deference to the Board's factual findings is particularly appropriate where the 'record is fraught with conflicting testimony and essential credibility determinations have been made.'" *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir. 1987) (quoting *NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 965 (4th Cir. 1985)). Furthermore, the court should not displace reasonable inferences drawn by the Board from the facts presented. *See Pikeville United Methodist Hosp. v. United Steelworkers of Am.*, 109 F.3d 1146, 1154 (6th Cir. 1997).

In its first issue in its petition for review of the Board's order, Kamtech contends that the Board erred in granting relief to Michael Cornell on his assertion that he was improperly denied an opportunity to be considered for a welding job at Kamtech's Hawesville site. In advancing this theory, Kamtech maintains that this court's decision in *Fluor Daniel* precludes relief for Cornell simply because Cornell was not qualified for a job as a TIG welder.[1]

---

[1] According to the testimony given before the administrative law judge by "Topper" Thomas, a Kamtech supervisor who oversaw structural pipe work, the difference between structural welding and TIG welding can be explained as follows:

Kamtech relies on *NLRB v. Fluor Daniel, Inc.*, 161 F.3d 953 (6th Cir. 1998), echoing our ruling there that "[t]here is no interference with, restraint, or coercion of applicants in the exercise of their protected rights when an employer, even with anti-union animus, rejects applicants who are in fact unqualified or for whose particular services the employer simply has no need." Reliance upon such an interpretation of the Act in this instance, however, can be of no avail to the petitioner in addressing the charges leveled by Cornell.

First, the record now before the court is undisputed that Kamtech was indeed seeking welders at its Hawesville work site. In fact, not only did a Kamtech representative in Owensboro first inform Cornell that the company was hiring in Hawesville, but the individual who answered the phone at the hiring location also confirmed that the company was looking to employ welders.

Second, even the *Fluor Daniel* majority recognized that anti-union animus cannot legally be manifested in such a manner as to result in different treatment for union applicants and non-union applicants. *See id.* at 974-75. Consequently, Kamtech's "justification" for failing even to consider Cornell for a welding job because of improper answers to questions unexpectedly asked over the telephone must fail in the face of testimony that the company routinely reserved its hiring decisions until *after* testing applicants by having them demonstrate their welding ability in person. Tellingly, testimony offered by Tony Holcomb established that even a pipefitter like Holcomb was offered a welding test before

---

Well, structural welding you are using a coated welding rod and in TIG welding you are using a Tungsten tip on a torch and you have to feed the wire and have a shield and you feed the Tungsten tip in the context with the metal, which heats the metal and you have to feed the wire with your opposite hand. As far as structural welding just uses a welding rod which it takes more skill to become a TIG welder, more practice. Normally most people start as a structural welder and then through time they get more experience and become a TIG welder.