**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0659n.06
Filed: August 30, 2006

**Nos. 05-2122/05-2163**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | |
| Petitioner/Cross-Respondent, | ) | |
| | ) | |
| v. | ) | ON APPEAL FOR ENFORCEMENT OF |
| | ) | AN ORDER OF THE NATIONAL |
| LOCAL 1640, AMERICAN FEDERATION | ) | LABOR RELATIONS BOARD |
| OF STATE, COUNTY AND MUNICIPAL | ) | |
| EMPLOYEES, AFL-CIO, | ) | |
| | ) | |
| Respondent/Cross-Petitioner. | ) | |

Before: DAUGHTREY and COLE, Circuit Judges, and GRAHAM,[*] District Judge.

**PER CURIAM.** Local 1640 of the American Federation of State, County and Municipal Employees, AFL-CIO, petitions for review of a decision of the National Labor Relations Board, which ruled that Local 1640 had engaged in unfair labor practices by violating its duty of fair representation in failing to process Remonia Murphy's grievance against her employer, Children's Home of Detroit.[1] The NLRB also petitions the court for enforcement of the Board's order. In light of the evidence presented before the administrative law judge in this matter, and in light of the deferential nature of our review

---

[*]The Hon. James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

[1] Murphy's related claim against Children's Home of Detroit was settled prior to the hearing on the issue of fair representation before the administrative law judge, and she is no longer employed at that facility.

of the administrative decision, we deny Local 1640's petition for review and grant the Board's petition for enforcement.

## PROCEDURAL AND FACTUAL BACKGROUND

Remonia Murphy was an employee of Children's Home of Detroit, a youth mental health facility in Grosse Point Woods, Michigan, from January 6, 1988, until September 29, 2003. Children's Home and the union were parties to a collective-bargaining agreement, pursuant to which Local 1640 represented the facility's childcare and food-service staff. During her tenure at Children's Home, Murphy was a union member and held several offices within the union, including unit steward in 1999 and unit co-chairperson in 2000, and was later described by the administrative law judge who heard this case as a "strong and forceful" advocate for unit employees.

In early 2001, Murphy ran for unit chairperson on a slate of candidates that sought to replace the incumbent local president, Arlean King. The election campaign was contentious and acrimonious. The tension between Murphy and King escalated throughout the campaign. At one point, King grabbed Murphy by the arm and threatened her. The next morning Murphy reported the incident to the police, and she subsequently obtained a protection order against King. Murphy also filed a complaint against King with the union's national office.

Murphy was elected unit chairperson in February 2001, and King was re-elected as president in January 2002, but these elections did not end the acrimonious relationship between King and Murphy. Evidence of continuing hostility between the two included: King's refusal to pay Murphy an officer's stipend, as had been done in the past; Murphy's exclusion from collective bargaining sessions that typically were part of a unit chairperson's responsibilities; and Murphy's removal from the office of chairperson prior to the completion of her three-year term and King's appointment of Zazal Jones as Murphy's replacement. That action was apparently taken without benefit of a new election, causing Murphy to send a letter of complaint to the union in April 2002.

In August 2003, as a result of her mother's illness, Murphy requested leave under the Family Medical Leave Act but, having not received a response by mid-September, she initiated a conversation with her acting supervisor, Jaime Sampson, in which she indicated that she was considering the possibility of resigning. Under the collective bargaining agreement, employees were required to give two weeks notice in writing of their intention to resign and, on September 17, 2003, Murphy did so, submitting a typed letter of resignation to Sampson. According to Murphy's testimony, upon receiving her notice of resignation, Sampson asked Murphy to "not rush into it" and to "think about it."

For a period of time following submission of the letter of resignation, Murphy was away from work for previously scheduled oral surgery. On September 26, 2003, she came back to Children's Home to see Sampson, told her that she had thought about her decision,

and said that she had decided not to resign. Sampson replied that she was happy with Murphy's change of heart, because she was needed at the facility. Sampson then asked Murphy to stay and work that day, even though it was not her scheduled work day, and Murphy agreed.

The next day, Cathy Anderson, Murphy's regular supervisor, called Murphy to thank her for not resigning. Murphy continued to work eight-hour shifts from September 26 through September 29. At the end of the workday on September 29, however, Sampson asked Murphy to accompany her to the office of Joe LaFata, the director of residential services. When they arrived, Zazal Jones (Murphy's replacement as unit chairperson) was also in LaFata's office. LaFata informed Murphy that Children's Home had decided not to allow Murphy to withdraw her resignation. According to Murphy, he said to her, "It's not me, Remonia . . . . I had nothing to do with this. This is not my decision." When Murphy pressed him on whose decision it was, LaFata said she should talk to the human resources department. Although Jones was present, she did not say anything during the meeting or speak with Murphy afterwards. The next day Murphy talked to Kurt Larkins in the human resources department, but he did not give any additional explanation for Children's Home's decision not to allow her to rescind her notice of resignation.

On October 1, 2003, Murphy called Lisa Grinston-Chapman, the union steward, and asked her to file a grievance on Murphy's behalf,[2] requested that Zazal Jones not be involved in her grievance because of Jones's failure to come to her defense during the meeting with LaFata, and asked Grinston-Chapman to notify her as soon as the grievance was filed. Grinston-Chapman spoke to former unit co-chairperson Kimberly Grimes and authorized Grimes to file a grievance for Murphy on Grinston-Chapman's behalf. Grimes prepared the grievance, signed for both Grinston-Chapman and Murphy, submitted it to Children's Home, and informed Grinston-Chapman of her actions. But, Grinston-Chapman did not inform Murphy that the grievance was filed.

On October 6, 2003, LaFata sent a memorandum to Grinston-Chapman stating that, after reviewing Murphy's grievance, he concluded that she had "resigned her position from CHD, she was not terminated" and that her grievance should be denied. Grinston-Chapman turned the memo over to Jones upon receipt, despite Murphy's request that Jones not be involved in the grievance process.

---

[2]Under the contract, the grievance process includes four steps:

Step 1. The employee reports the matter to his supervisor in the presence of the union steward, or the steward files the grievance on behalf of the employee, within 7 days.

Step 2. If the matter is not settled, the steward submits the grievance to the Director of Residential Services within 5 days thereafter. The aggrieved employee must sign the grievance.

Step 3. If the answer of the Director of Residential Services is unacceptable, the unit chairperson notifies the employer, and a meeting is held with representatives of the union and the employer. The employer submits its answer to the grievance within 3 days thereafter.

Step 4. If the grievance is not resolved, the matter may be submitted to arbitration within 45 days of the employer's response in Step 3.

On Tuesday, October 14, 2003, Jones left a voice message on Murphy's home telephone informing her that a meeting was scheduled for Thursday, October 15, to discuss the grievance. Murphy was concerned that the information Jones left was not accurate, both because of her troubled relationship with Jones and because October 15, 2003, was a Wednesday, not a Thursday. She called Sharon Donahue, the union representative who participated in such grievance meetings to confirm that a meeting had indeed been scheduled. Donahue told Murphy she was unaware of any meeting and was not even aware that Murphy had filed a grievance. Later that week, Murphy filed a formal charge with the NLRB against Children's Home and Local 1640.

Following a hearing conducted before an administrative law judge, the ALJ concluded that "[t]here is substantial evidence of union hostility and animus toward Murphy" arising out of the political rivalry between King and Murphy and that the union "arbitrarily and in bad faith failed to process Murphy's grievance" in violation of § 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A). The ALJ also held that, had the union properly processed her grievance, Murphy would have succeeded on the merits because there was substantial evidence that Children's Home had a past practice of allowing an employee to revoke or withdraw a letter of resignation prior to the conclusion of the two-week notice period. As a result, the order of relief required the union to make Murphy whole for losses that resulted from its failure to process her grievance.

In support of the finding of hostility, the administrative law judge pointed to evidence

of:

> . . . King's cursing at and physically threatening Murphy, Murphy's obtaining a State court protection order against King, King's refusal to pay Murphy the stipend that had been paid to the former unit chairperson, King's refusal to include Murphy in the  negotiations for the collective bargaining agreement, Murphy's various complaints to higher union officials regarding King, Jones' replacement of Murphy as the unit chairperson, which was accomplished with King's assistance, King's calling Murphy a bitch within 2 months of Murphy's termination, and Jones' failure to say anything to Murphy or to LaFata during the meeting in which LaFata informed Murphy that her employment was terminated.

The ALJ also found that the union:

> . . . failed to investigate the grievance.  The record fails to establish that a step-3 meeting was held on the grievance.  Moreover, if a meeting were held, the [union] failed to notify Murphy of the proper date and time of the meeting . . . .  In addition, the [union] failed to submit the grievance for arbitration as provided by step 4 of the grievance procedure.

In addition to the facts and conclusions above, the ALJ also evaluated Grinston-

Chapman's credibility and testimony:

> Grinston-Chapman's statement to Murphy on October 15 that she had heard nothing from CHD regarding Murphy's grievance was not true.  On October 8, Grinston-Chapman received a memorandum from LaFata containing Children's Home's step-1 denial of Murphy's grievance.  CHD denied the grievance because it claimed that Murphy was not terminated, but rather, she had resigned.  After Grinston-Chapman received this response, she immediately turned it over to Jones.  Grinston-Chapman's transfer of Murphy's grievance was contrary to Murphy's request that Jones not get involved in the grievance, and it was the first time that Grinston-Chapman

turned over to the unit's chairperson a grievance response that had been given to her.

In her demeanor and in her testimony, Grinston-Chapman was not a credible witness. She appeared to be troubled or uneasy throughout her testimony, which was given in the presence of King. Indeed, she often looked at King during her testimony. When Grinston-Chapman was asked, "Did Remonia ever contact you at any point directly to ask you to get involved in her grievance?" she responded, "I don't recall speaking to Remonia." Such testimony is not credible . . . . It is not credible that Grinston-Chapman did not talk to Murphy concerning the grievance, and it is not credible that Grinston-Chapman did not remember talking with Murphy about the grievance. Finally, and perhaps most disturbingly, Grinston-Chapman signed a false statement on October 27 saying that she had not received a response from [Children's Home] to Murphy's grievance. For all of these reasons, Grinston-Chapman was not a credible witness.

With one exception, the National Labor Relations Board adopted the ALJ's finding of fact and conclusions. The Board did not rely on the ALJ's finding that the union "was, at least, partially responsible for Murphy's termination," the focus of the union's first exception. In adopting the ALJ's decision, as modified, the Board found that the union violated § 8(b)(1)(A). The Board also noted that, in accordance with the decision in *Iron Workers Local 377 (California Iron Workers Employers Council)*, 326 NLRB 375 (1998), the union's liability is limited "to the portion of damages attributable to its failure to process Murphy's grievance," and thus modified the ALJ's order accordingly. The union now petitions for review and the Board petitions for enforcement of its order.

**DISCUSSION**

We review the NLRB's legal conclusions de novo. *Mt. Clemens Gen. Hosp. v. NLRB*, 328 F.3d 837, 844 (6th Cir.2003). In addition, we treat the Board's factual determinations as conclusive when they are supported by substantial evidence on the record considered as a whole, even if we "might have reached a different result had the matter been before us de novo." *NLRB v. Buckhorn Hazard Coal Corp.*, 472 F.2d 53, 55 (6th Cir.1973); *see also NLRB v. Tid-Bit Products Co.*, 620 F.2d 581, 582 (6th Cir.1980). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 967 (6th Cir.2003) (quoting *DuPont Dow Elastomers, L.L.C. v. NLRB*, 296 F.3d 495, 500 (6th Cir.2002). Moreover, "[d]eference to the Board's factual findings is particularly appropriate where the 'record is fraught with conflicting testimony and essential credibility determinations have been made.'" *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir.1987) (quoting *NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 965 (4th Cir.1985)). Because the ALJ is the trier of fact in the first instance, credibility determinations "are to be accorded considerable weight on review." *Local Union No. 948, Intern. Broth. of Elec. Workers, AFL-CIO v. NLRB.*, 697 F.2d 113, 117 (6th Cir. 1982).

As the exclusive bargaining representative for employees, a union has a statutory duty of fair representation, both in collective bargaining and in enforcement of the collective bargaining agreement. *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). This duty requires the

union to "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Id.*; *Local 594, Int'l Union, United Auto., Aerospace & Agri. Implement Workers of Am., UAW v. NLRB*, 776 F.2d 1310, 1315 (6th Cir. 1985).

A union breaches its duty of fair representation when its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190. A breach may occur when a union fails to process a grievance "because an employee has differed with a union policy or an official while the employee is engaged in activity protected by the Act." *Local 594*, 776 F.2d at 1315 (citing *Abilene Sheet Metal, Inc. v. NLRB*, 619 F.2d 332, 347 (5th Cir.1980)). Of course, a union has a broad range of discretion in determining which grievances to pursue, and mere negligence is insufficient to form the basis for a violation. However, once a union decides to process a grievance, its abandonment because of ill will or other invidious considerations constitutes a breach of its duty of fair representation. *Bottle Blowers Local 106*, 240 NLRB 324 (1979).

In this case, the union argues that the ALJ's decision, as adopted by the Board, was not based on substantial evidence, contending that the judge relied on an incomplete record and that there was insufficient evidence to support the conclusion that Murphy was subjected to bad faith or arbitrary treatment. The union also challenges the ALJ's conclusion that the grievance would have been successful.

The inquiry into a fair-representation case is whether the union's acts or omissions show that its conduct was arbitrary, discriminatory, or in bad faith. *See Vaca*, 386 U.S. at 190. The Supreme Court has explained that "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' . . . as to be irrational." *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 111 (1991) (citation omitted); *see also Nida v. Plant Protection Ass'n National*, 7 F.3d 522, 526 (6th Cir. 1993) (quoting *Air Line Pilots*). In addition, we have noted that "an unwise or even an unconsidered decision" by the union is not necessarily an irrational decision. *Id.*, 7 F.3d at 526 (internal citation omitted).

Citing *Black v. Rider/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584-85 (6th Cir. 1994), the union argues that it did not mishandle Murphy's grievance, as "a plaintiff will not succeed if he can show only slightly unreasonable behavior on the part of the union." *Id.* Although we noted in *Black* that "[a] union does not . . . have to exhaust every possible remedy requested by a member facing disciplinary action," the panel also held that "[a] union must nonetheless undertake reasonable investigation to defend a member from employer discipline." *Id.* There is no indication on this record that the union did any investigation into the grievance; Jones failed to speak up at the meeting in which LaFata informed Murphy he would not allow her to rescind her resignation; there are multiple instances establishing that the union not only failed to inform Murphy of the status of her

grievance but also affirmatively *misrepresented* the status of the grievance; and, finally, the union never informed Murphy that it abandoned her grievance.

The ALJ's finding of a violation hinged on the credibility of the witnesses. In light of the facts and the witnesses' demeanor and testimony, the judge credited Murphy's testimony over that of Grinston-Chapman. There is nothing in the record to suggest that we should overturn the administrative law judge's determinations of credibility. Thus, in light of the record before us, we conclude that the administrative law judge's conclusion that the union violated its duty of fair representation is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fluor Daniel*, 332 F.3d at 967 (internal quotation omitted).

In order for an employee to recover in a duty of fair representation claim, she must also prove that the grievance would have been meritorious. The ALJ held that:

> [Childlreln's Home] had established a practice of allowing employees to withdraw letters of resignation within the 2-week period of the letters, and Murphy is the only employee who was not allowed to withdraw her letter of resignation. Moreover, although an unlawful motivation need not be shown in order to prove a violation of the agreement, the evidence establishes that [Children's Home's] motivation for its action was, at least in part, due to Murphy's strong and forceful advocacy on behalf of unit employees.

As a result, the judge found that "Murphy would have won on the merits if the grievance had been properly pursued by the Union," based principally on the testimony of Children's Home employees Melissa Baisch and Tasha Montgomery, both of whom had been allowed

- 12 -

to withdraw their notice of resignation. He also noted that, prior to the date of her final termination, Murphy's immediate supervisors "treated Murphy like [Children's Home] had treated other employees in similar situations" by inviting her to resume work "as if she had never resigned."

The union argues that there was insufficient evidence that there was a past practice of allowing employees to rescind a notice of resignation, but the Board notes on appeal that the union did not preserve this argument for review. If a litigant fails to present an issue before the Board, "judicial review is barred by § 10(e) of the Act, 29 U.S.C. § 160(e), which provides that '[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.'" *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-666 (1982); *Allied Mechanical Services, Inc. v. NLRB*, 113 F.3d 623, 627 (6th Cir. 1997) ("reviewing court lacks jurisdiction to entertain objections not raised before the Board").

Our review of the administrative record supports the Board's reading. The union did not object to the ALJ's finding on the merits of the grievance or the conclusion that Murphy would have prevailed at arbitration. Nor does the union claim that there are extraordinary circumstances that would excuse its failure to do so. Thus, judicial review of this argument is precluded, pursuant to § 10(e) of the NLRA and *Woelke.* Moreover, we conclude on this

record that there is substantial evidence to support the ALJ's conclusion with regard to past practice.

In summary, we find that factual determinations of the Board are supported by substantial evidence on the record, that the inferences drawn by the Board from those facts are reasonable, and that the Board's legal determinations are both relevant and correct. We therefore DENY Local 1640's petition for review and GRANT the Board's application for enforcement of its order.